## In re NEW YORK TITLE & MORTGAGE CO.

District Court, N. D. New York.
Dec. 1, 1934.

Kraus, Leman & Parker, of New York City (George J. Hatt, of Albany, N. Y., of counsel), for petitioner.

Harry Rodwin and Schurman, Wiley & Willcox, all of New York City (Jacob Gould Schurman, Jr., Harry Rodwin, Nathaniel J. Palzer, Joseph Lapidus, and Irving H. Jurow, all of New York City, of counsel), for George S. Van Schaick, as Superintendent of Insurance of state of New York, and New York Title & Mortgage Co.

COOPER, District Judge.

In June, 1934, certain mortgage certificate holders of the New York Title & Mortgage Company filed a petition under section 77B of the Bankruptcy Act, approved June 7, 1934 (11 USCA § 207), for reorganization of the company, alleging that they were three in number and had provable claims against the corporation which amounted in the aggregate to $1,000 or more in excess of the value of the securities held by them and the other necessary jurisdictional facts.

The debtor corporation was incorporated under the Insurance Law of the state of New York.

A brief history of the company is contained later herein.

On August 4, 1933, the superintendent of insurance of the state of New York, hereinafter called the superintendent, took possession of the property and affairs of the company under an order of rehabilitation made by the Supreme Court of the state of New York pursuant to article 11 of the Insurance Law of the state of New York (Consol. Laws, c. 28, § 400 et seq.), and has ever since held such possession and administration of its affairs as rehabilitator.

The superintendent, as rehabilitator of the company, has appeared and answered, putting in issue practically all of the allegations of the petition except insolvency.

On the return day of the creditors' petition, the superintendent moved to dismiss the petition for insufficiency and lack of jurisdiction on the part of the court. The court reserved decision until the proofs of the various parties had been presented.

At the conclusion of the proof, the superintendent renewed his motion to dismiss the petition upon the following grounds:

(1) That the alleged debtor is an insurance corporation and is therefore not subject to reorganization under section 77B.

(2) That petitioners have failed to bring themselves within the provisions of sections 77A and 77B of the Bankruptcy Act [11 USCA §§ 206, 207] because they have failed to show:

(a) A prior bankruptcy proceeding.

(b) A prior equity receivership.

(c) An act of bankruptcy within four months.

(3) That the petition was not filed in good faith.

(4) That there are not three or more creditors having claims of $1,000 in excess of securities held by them.

(5) That section 77B is unconstitutional.

The superintendent does not press the last objection and no attention need be paid thereto.

Nor need much consideration be given to the contention set up at (4) above that petitioners have no claim in excess of $1,000 above their securities.

The petitioning creditors offered proof of two kinds upon this point. One was the market value of the certificates and the other the market value of the properties covered by the underlying mortgages. The superintendent offered proof of the value of the real property.

The proofs showed a market for these certificates and a reasonable number of sales. There can be little doubt that the petitioning creditors' certificates cannot now be sold for more than about one-half of their face or par value.

The proof offered by petitioning creditors of the value of the real properties covered by the underlying mortgage carries greater weight than the corresponding proof of the superintendent because supported by occasional sales of similar property. The opposing proof is admittedly in some instances not of values of 1934, but of a time when real property will regain at least a substantial part of its former value. At least one of the superintendent's witnesses admitted that there was little or no market for real property at this time.

The court may also, perhaps, take judicial notice that real estate values in the cities are at a distressingly low figure.

The finding must be that the petitioning creditors are at least three and the aggregate value of their claims beyond their security exceeds $1,000.

The superintendent's contention that the petition was not filed in good faith (3) rests on two grounds: (1) That the statute was primarily enacted for the relief of embarrassed debtor corporations and that the provision permitting creditors to institute reorganization proceedings was a mere afterthought and should be held to be inapplicable until the debtor corporation has tried reorganization and failed; and (2) that the state rehabilitation proceedings under the Insurance Law offers all and more in the way

of rehabilitation and reorganization than can be accomplished under the provisions of the Bankruptcy Act, new and old. Whether or not the provision of the statute permitting creditors to institute reorganization proceedings was an afterthought, the fact remains that such right of creditors is definitely stated in the statute and must be given the effect intended by the statute.

█ There is no force to the contention that creditors must await the attempt and failure of the debtor corporation to reorganize in the case at bar, for the statute does not so require and the debtor is in the hands of the superintendent and cannot file a petition for reorganization without the consent of the superintendent and the state court. The debtor has appeared in this case only by the counsel of the superintendent and is subject to his will. The creditors have presented a carefully considered plan of reorganization, which, with some modifications, seems well calculated to serve the interest of both the debtor and the creditors.

█ Nor does the fact that the debtor corporation is in the custody of the superintendent in rehabilitation proceedings militate against the good faith of the petitioning creditors. For nearly a year prior to the institution of these proceedings, the superintendent has had the debtor in rehabilitation and little has been done toward practicable rehabilitation or reorganization. This is not the fault of the superintendent. Not only does it seem that it would be almost miraculous for the superintendent to rehabilitate this company, with its present corporate structure and with the ramifications in many states, but it may well be doubted that his rehabilitation powers under the New York Insurance Law are broad enough to permit any reorganization of the debtor upon the broad lines of the Bankruptcy Act or otherwise, at least without the consent of the stockholders and multitudinous creditors.

Rehabilitation under the state Insurance Law seems to contemplate rather that the superintendent shall administer the affairs of the company free from interference by creditors with the company's property, in the effort to work out its financial troubles and restore it to its officers and directors with unchanged corporate structure and with sufficiently improved financial condition so that it may conduct its affairs in safety after the rehabilitation.

The superintendent was a witness in these proceedings and said no decision had been reached whether or not the rehabilitation would be turned into liquidation, but that some other companies would have to be liquidated.

In this case there are branches and subsidiaries in other states beyond the authority of the superintendent.

There seems no good reason to believe from the record of this proceeding that the superintendent can within any reasonable time do what seems miraculous and rehabilitate the debtor company. There is no reason to find that the creditors acted in anywise other than in the honest belief that the interests of the company and its creditors and stockholders could be benefited by reorganization under the Bankruptcy Act.

Upon the contention set forth in (2) above that the creditors have failed to satisfy the requirements of section 77B, it is quite clear that the petitioners have not alleged nor proved either a prior proceeding in bankruptcy or an act of bankruptcy within four months. The statute is satisfied if a prior equity receivership is shown.

The petitioning creditors claim they have proved such prior equity receivership.

This, the creditors say, is the rehabilitation proceedings under which the superintendent of insurance is administering the affairs of the company. The creditors say that very question has been decided by the Circuit Court of Appeals of this Circuit in Jacoby v. Bond & Mortgage Guarantee Company, 72 F.(2d) 420.

This relates to a suit in equity in this court in which certain nonresident certificate holders sought to have trustees appointed, as successors to a company in all respects like the debtor, of the underlying bonds and mortgages deposited with a depositary, participating certificates of ownership of which were sold in different series to thousands of persons like the petitioning creditors. In such suit, the superintendent contended that his status was equivalent to that of a receiver in equity, and that his custody of the underlying bonds and mortgages was custodia legis.

This court decided that the superintendent was not a receiver appointed by a court of equity or any court, but that he was a state administrative officer; that while, as superintendent, he had the right to the custody of the property of the debtor company as rehabilitator, he had no right to the custody of the bonds and mortgages in question which were not the property of the corporation but of the certificate holders, or at least no right to such custody after the appointment by a

court of equity of successor trustees; and that his custody was not custodia legis.

The Circuit Court of Appeals, however, on appeal by the superintendent, reversed this court and dismissed the complaint. The sole ground for the reversal was that the property in question, as well as the property of the company, was in custodia legis.

The superintendent cannot say in another case in this court and in the Circuit Court of Appeals that he has the status of a receiver in equity; that assets of the company in his custody are in custodia legis; and then say in this court in the case at bar, involving the assets of a like company, that he does not have the status of an equity receiver and that the assets of this company in his custody are not in custodia legis.

██ The Circuit Court of Appeals said he was right in the other case. This court is bound by that decision and must find that the assets now, as then, are in custodia legis and that he has the status of an equity receiver. The statute is, therefore, satisfied in this respect.

But the more serious question is whether the debtor is an insurance corporation or for other reasons cannot be brought by the creditors' petition within the provisions of section 77B (11 USCA § 207).

Section 77B, so far as applicable here, is as follows:

"Sec. 77B. *Corporate Reorganizations.* (a) Any corporation which could become a bankrupt under section 4 [section 22] of this title, and any railroad or other transportation corporation, except a railroad corporation authorized to file a petition or answer under the provisions of section 77 [section 205] of this chapter, and except as hereinafter provided, may file an original petition, or, before adjudication in an involuntary proceeding, an answer, or in any proceeding pending in bankruptcy, whether filed before or after this section becomes effective, provided the present operations of such corporation do not exclude it hereunder, and whether or not the corporation has been adjudicated a bankrupt, a petition stating the requisite jurisdictional facts under this section. * * *

"Three or more creditors who have provable claims against any corporation which amount in the aggregate, in excess of the value of securities held by them, if any, to $1,-000 or over may, if such corporation has not filed a petition or answer under this section, file with the court in which such corporation might file a petition under this section, a petition stating that such corporation is insolvent or unable to meet its debts as they mature and, if a prior proceeding in bankruptcy or equity receivership is not pending, that it has committed an act of bankruptcy within four months, that such creditors propose that it shall effect a reorganization. * * *"

This statute was plainly intended to permit reorganization of distressed corporations. It applies only to corporations which under section 4, as amended (11 USCA § 22), could file petitions in bankruptcy and also to certain railroad corporations.

Under section 4 of the Bankruptcy Act, as amended (11 USCA § 22), a municipal, railroad, insurance, or banking corporation may not become a bankrupt voluntary or involuntary.

Railroad corporations are included because specially mentioned in 77B as coming within its provisions and are no longer controlled by section 4, as amended.

There is no like mention of insurance companies in 77B.

The contentions of the respective parties center around three issues:

1. Was the debtor an insurance corporation before rehabilitation, within the meaning of section 4?

2. Was the debtor amenable to section 77B when the petition was filed on June 8, 1934, because it was not then an insurance corporation or because of the provision of the section relating to "present operations."

The first question presents little difficulty.

The debtor corporation was incorporated under article 5 of chapter 690 of the Laws of 1892, which is part of the state Insurance Law, with the name of the Title Insurance Company of New York. The objects for which it was incorporated, stated in its certificate of incorporation, are: "To examine titles to real property and chattels real, to procure and furnish information in relation thereto, make and guarantee the correctness of searches for all instruments, liens or charges affecting the same; and guarantee or insure bonds and mortgages and the owners of real property and chattels real and others interested therein against loss by reason of defective titles thereto and other incumbrances thereon."

Section 170, subd. 2, of the aforesaid article 5 of the Insurance Law, as amended by Laws 1913, c. 215 (Consol. Laws, c. 28), authorizes the exercise of certain powers not

enumerated in the certificate of organization and provides at the end thereof: "Any corporation heretofore organized under subdivision one of this section shall have all the powers conferred by such subdivision as amended hereby."

The name was subsequently changed to the "New York Title Insurance Company." In 1927, it was merged with the New York Mortgage & Security Company under the present name, the New York Title & Mortgage Company. This merger was approved by the superintendent of insurance and by the superintendent of banks of the state of New York.

The mortgage company was organized under article 7 (former article 5) of chapter 2 of the Consolidated Laws of New York, known as the Banking Law, which provides for the incorporation of investment companies and gives such companies power to guarantee and sell bonds and mortgages as a whole or in parts (certificates).

The merger was stated to be in accordance with section 179 of the state Insurance Law (amended by Laws 1916, c. 345), which provides, in substance, that the merged corporation should have only such rights to do business as were permitted by the Insurance Law and should continue under the supervision of the superintendent.

The debtor has always attempted to comply with the requirements of the Insurance Law and has always submitted to the supervision of the superintendent. Various increases in capital stock have been made with the approval of the superintendent.

Since its incorporation, the debtor has written $1,000,000,000 of title insurance which is still outstanding.

At the time of the rehabilitation order in August, 1933, the debtor had over $500,000,000 of guaranteed mortgages outstanding and this had been as high as $700,000,000 in 1932.

This business was done in twenty-five states and permits to do business were outstanding in nearly, if not quite, all of those states in August, 1933, when the superintendent took over the debtor in rehabilitation.

Upon their expiration, practically none were renewed.

The income received from the various activities of the debtor are, doubtless, the controlling factor in determining whether the debtor comes under section 77B.

The income for 1930 is as follows:

### 1930 Income.

| | |
|---|---:|
| Title Insurance, | $ 642,870.00 |
| Guaranteed Mortgages, | 3,195,118.57 |
| Exam. Fees (For Records), | 3,105,157.49 |
| Searches (No Title Policy), | 123,990.76 |
| Conveyancy, Title Insurance, | 33,786.60 |
| Surveys, for Title Insurance, | 125,807.22 |
| Commissions and Renewals, | 622,766.60 |
| Interest on Mortgage, Loans, | 1,208,825.10 |
| Interest on Mortgages between taking and selling intended for sale, collateral loans, earnings, | 292,680.20 |
| Bonds, | 160,677.13 |
| Int. on Deposits in Banks, | 68,085.00 |
| Miscellaneous Interest, | 77,331.60 |
| Dividends, on stock of Subs. Corps., | 639,907.37 |
| Gross profit on sale at maturity of Bonds, | 5,976.82 |
| Gross profit on sale of Stock, | 194.00 |
| Gross Increase by Adj. in Book value of Ledger Assets, | 241,184.99 |
| Net gain from change in —— between book and market value of Bonds, | 9,949.17 |
| Net gain from change in —— between book and market value of Stocks, | 1,929,029.89 |
| Miscellaneous, | 10,097.99 |
| Total Income, | $10,572,407.15 |

The income for 1931 and 1932 was substantially in the same proportions as that of 1930.

It appears that in the 1930 income, the following items may be said to be derived from insurance business or incidental matters directly connected therewith. These items are as follows:

| | |
|---|---:|
| Title Insurance, | $ 642,870.00 |
| Mortgages Guaranteed, | 3,195,118.57 |
| Fees for examination of records of Title of property, either the subject of guaranteed mortgages or the subject of title insurance, without mortgages, | 3,105,157.49 |
| Searches where no titled policy was issued, | 123,990.76 |
| Conveyancing in connection with Title Insurance, | 33,876.60 |
| Surveys for Title Insurance or of mortgages guaranteed or both, | 125,870.22 |
| | $7,226,793.64. |

To this may be added interest on mortgages held between the time of their taking and selling and claimed to be intended for sale $1,208,825.10.

An insurance company has to carry reserves to safeguard itself against its liabilities on its insurance obligations. During this year, this company had about $1,000,000,000 outstanding on title insurance and had, of course, to carry a substantial reserve.

The income from this reserve may fairly be said to be income on insurance business, at least, it is not income from any other kind of business.

Even though some parts of the $1,208,-825.10 interest on mortgage loans may be partly interest on mortgages carried in reserve as well as interest on mortgages taken exclusively for the purpose of sale of guaranteed mortgages, such items should be wholly included therein. So also should be at least some part, if not the whole, of items like interest on bonds amounting to $160,677.-13, interest on deposits in bank, $68,085, and probably miscellaneous interest, $77,331.61.

The item of earnings on collateral loans amounting to $292,680.20 is not so clear. True, this is probably in the nature of a banking business, but it may also be part of the capital of the company available for the purchase of mortgages for sale as guaranteed mortgages or mortgage certificates and temporarily loaned on collateral.

The items of net gain between book value and market value of the bonds and stocks amounting to $1,938,939 may be debatable. If the company was permitted to carry stocks in its reserve, the dividends from stocks might be fairly considered as part of the income from the insurance business. If, however, the purchase of these stocks were in the nature of a stock speculation, they are not.

■ The dividends on the stock of subsidiary companies may or may not be properly applicable to an insurance business. In so far as activities of these subsidiaries were an aid to the parent company in safeguarding its guarantee of mortgages and managing the property taken in by foreclosure or by deed and satisfaction of defaulted mortgages, it may fairly be said to have been an insurance business. In so far as they were engaged in any other kind of real estate activity, they were not. Generally speaking, the burden of these matters is on the petitioning creditors.

Further discussion of detail seems unnecessary. Not less than three-fourths of the income during the year 1930 was received from what may fairly be called insurance business. Indeed, the record discloses little activity of the company other than the insuring of title, the guaranteeing of mortgages and mortgage certificates, and things incidental thereto.

Quite true, there was sometimes sold a mortgage without a guarantee, but so also it sometimes guaranteed a mortgage which it did not take in the first instance. So too, it had an item of $622,766.60 for commissions and renewals of mortgages.

This is claimed to have been insurance business because of the renewal of the guarantee of the mortgage, but it is not clear that all of it is. But what is reasonably clear is that there is nothing in the record to indicate that this company bought and sold real estate or dealt to any extent in the purchase and sale of mortgages at the profit which it did not guarantee. Nor does it disclose any substantial business more strictly of a banking nature.

■ So that all told, the record puts this case in close analogy with U. S. v. Home Title Insurance Company, 285 U. S. 191, 52 S. Ct. 319, 76 L. Ed. 695, in which the Supreme Court held that the company was an insurance corporation within the meaning of the tax law and that the tax law used the term "insurance company" in its ordinary sense. So it must be held here.

While neither its certificate of incorporation nor its supervision by the superintendent is conclusive as to the nature of the business, the fact that little other than insurance business is shown seems to make the matter quite clear that it was an insurance company.

The creditors contend that the guaranteeing of mortgages and mortgage certificates is not an insurance business because these mortgage certificates have been held to be merely secured obligations of the debtor, citing in support thereof People v. Title & Mortgage Guarantee Company of Buffalo, 264 N. Y. 69, 88, 190 N. E. 153.

The question of whether or not the guaranteeing and sale of mortgage certificates was insurance business was not before that court. The only question before the court was the constitutionality of the certificate series reorganization provisions of the recently enacted amendment to the Insurance Law called the Schackno Act (Laws N. Y. 1933, c. 745).

The Home Title Case is in close analogy and seems controlling here.

The final question is, Was the debtor amenable to section 77B when the petition was filed on June 8, 1934, because it was not then an insurance corporation or because of the provision of the section relating to "present operations"?

■ Here also its certificate of incorporation is not conclusive. Bowers v. Lawyers' Mortgage Company, 285 U. S. 182, 52 S. Ct. 350, 76 L. Ed. 690.

It will be remembered that the superintendent of insurance, after putting certain restrictions on the business of the debtor about March 1, 1933, took over the debtor's property in rehabilitation on August 4, 1933.

The debtor was still in rehabilitation when the creditors' petition was filed June 8, 1934. Since rehabilitation, the debtor has done no original insurance business, that is, it has written no title insurance and guaranteed no mortgages or mortgage certificates. A subsidiary newly formed by the superintendent and all of whose stock is held by the debtor has written about $50,000,000 of title insurance.

The activities of the debtor in rehabilitation are stated in the brief of the superintendent as follows:

"Obviously, the fact that the Company is not writing any new business does not in and of itself cause it to cease being an insurance corporation, since the writing of new business is not the sole function of an insurance corporation. Once Title policies and policies of mortgage guaranty have been issued numerous functions devolve upon the debtor corporation in carrying out its contractual obligations assumed under these policies. All of these functions were continued by the Superintendent of Insurance as rehabilitator and are still being carried out (S. M. pp. 275–283; 296–300). The Title Company continued to service the mortgages for the guarantee holders pursuant to the agency agreement contained in the contract of guarantee; the company has been active in the extension of approximately 642 mortgages, involving approximately $5,000,000; in the operation of properties under assignments of rents on behalf of the certificate of guaranteed mortgage holders; in the servicing of mortgages; in the conduct of the 572 foreclosure actions involving $35,000,000; in the execution of more than 2,000 leases; in the conducting of approximately 5,000 dispossess proceedings involving $473,000; in the filing of protests on applications for reduction of tax assessments; in the instituting of more than 800 certiorari proceedings; and in the defense of over 1,830 law suits on title policies with respect to title insurance—all these activities made necessary by reason of the company's obligations on its policies of title insurance and mortgage guarantees. (S. M. pp. 434 et seq.)."

The so-called servicing the guaranteed mortgages, so far as properties taken over by deed or foreclosure are concerned, has latterly been done by a subsidiary corporation whose stock is wholly owned by the debtor. The debtor itself seems to have collected the interest on the mortgages not in total default, and, after deducting the ½ per cent.,

has paid the remainder in part to mortgage or certificate holders and in part for other purposes of the rehabilitation.

The debtor's income and business during 1933 naturally reflects the serious interference with its normal course, due to the changes in the conduct of the business by the superintendent.

The income for 1933 is given in the superintendent's report as follows:

The income for 1933 is as follows:

| | | | |
|---|---|---|---|
| 1. Title Insurance, Mortgage Guarantees (Premiums on Guaranteed certificates included with interest on equity in collateral mortgages under 3 (A-2). | | $ 58,947.48 | |
| | | 1,233,425.98 | $1,292,373.46 |
| 2. Fees for | | | |
| (a) Examinations, | | 164,566.61 | |
| (b) Searches, | | 28,392.83 | |
| (c) Conveyancing, | | 1,025.00 | |
| (d) Appraisals, | | 0.00 | |
| (e) Surveys, | | 14,263.74 | |
| (f) ............ | | 0.00 | |
| (g) Special services, | | 55,663.20 | |
| Extension fees, | | 96,029.28 | |
| Commissions, | | 3,897.76 | |
| | | | 363,838.42 |
| 3. Interest earned on, | | | |
| (a) Mortgage loans, | | | |
| Free, | | 505,021.92 | |
| Pledged, | | 794,129.56 | |
| (a) 2, Mortgage loans, Certificated, —net, (includes premium and interest on Equity) | | 1,173,455.40 | |
| (e) Bonds, | | 28,583.95 | |
| (f) Deposits, | | 11,058.96 | |
| (h) Additional Int. | | 11,190.00 | 2,523,439.79 |
| 4. Dividends on Stock Owned, | | | 3,794.09 |
| 6. Rents, Including $—— for occupancy of its own buildings, | | | 1,158.00 |
| 8. (e) Revaluation of Title Plant, | | 600,000.00 | |
| (f) Adjustment of previous years tax reserves, | | 135,248.27 | 735,248.27 |
| 10. Other Items, | | | |
| (a) Miscellaneous, | | 4,214.37 | |
| (b) Recovery of accts receivable charged off, | | 15,305.17 | |
| (c) Reserve for lease settlement transferred to undivided profits, | | 17,436.00 | |
| (d) Loan fees and premiums received in prior years transferred to undivided profits, | | 142,491.52 | 179,447.06 |
| 11. Total Income, | | | $5,099,299.09 |

The item "Title Insurance" $58,947.48 was undoubtedly business done before rehabilitation.

How much of the items under (2) were before rehabilitation cannot be determined, but some undoubtedly were.

The items designated (8) and (10) may be disregarded as not income from the business of the year 1933.

Probably all of the items of interest under (3) of the statement of income and some part of the mortgage guarantees under (1) are income from the mortgage guarantee business or things incidental thereto, or from the reserve. These together make more than half of the income properly applicable to the year 1933.

Considered as received from a continuation in part of a previous insurance business, it may be considered as income from an insurance business and help characterize the debtor in rehabilitation as an insurance company.

It is argued here in effect that the fact that this collection of one-half of 1 per cent. arises from mortgage guaranty business prior to rehabilitation must be disregarded, and that it should be held that such collection might be done by a real estate corporation organized under the Stock Corporation Law of the state (Consol. Laws N. Y. c. 59).

Bowers v. Lawyers' Mortgage Company, 285 U. S. 182, 52 S. Ct. 350, 76 L. Ed. 690, supra, upon which the creditors rely, was a case in which the company sought to escape the payment of certain internal revenue taxes on the ground that it was an insurance company taxable only under section 246 of the Revenue Act of 1921, 42 Stat. 262. This company insured no titles, but, among other things, guaranteed and sold mortgages and mortgage certificates.

Stating that such business could be carried on by a corporation organized under the Banking Law of the state of New York, as well as under the Insurance Law of the state, under which laws that company was incorporated, the court held that the income from the mortgage guarantee business was less than one-third of the total income of the company and that, therefore, it was not an insurance company under section 246.

It also said that the element of insurance might not properly be regarded as more than an incident of the company's business.

Even if it were held in the case at bar that the income from the ½ per cent. of the interest collected by the debtor in re-

habilitation was a banking business rather than an insurance business, it would not help the creditors in this case, for neither banking nor insurance companies are amenable to section 77B.

Certainly the court in Bowers v. Lawyers' Mortgage Company did not hold the business of the Lawyers' Mortgage Company to be a real estate business or discuss that question. In view of the fact that such ½ per cent. originated in guaranteed mortgage certificate contracts, which is a kind of insurance business and is in the nature of continuing compensation or premium for the guarantee, it is extremely doubtful that collection of such ½ per cent. can be disassociated from its origin and called simply a real estate or any other ordinary business of a corporation amenable to section 77B. The better view is that even in rehabilitation the debtor is an insurance corporation within the meaning of sections 4 and 77B.

Moreover, it does not seem that section 77B can have one application to a corporation which is clearly not amenable to the section before it comes into court custody or rehabilitation under the superintendent and another application making it amenable to the section, to the same corporation after such court custody or rehabilitation, merely because the court custodian or rehabilitator has temporarily, or in part, discontinued a part of the business it did as a nonamenable corporation.

Court custody in equity and rehabilitation under the state Insurance Law both imply expected restoration of the corporation to its officers who may resume all of its former business and activities and make it again nonamenable to the section. Such a varied application seems unreasonable.

In the House Report 194, to which the creditors refer, it is said:

"* * * It is believed that an expansion of the opportunity for amicable adjustment by debtor and creditor under the supervision of the bankruptcy courts, and for holding the property of the debtor intact with its operations as little disturbed as practicable, such as is provided for in this bill, will prove itself to be of permanently helpful assistance both to distressed corporations and in line with the public interest."

This warrants a reasonable inference that the Congress did not contemplate that the section would be applicable to excluded insurance and banking corporations only when their operations were so greatly disturbed, while in court custody, as to change them in-

to noninsurance and nonbanking corporations and not applicable, if while in such custody they remained insurance and banking corporations. And yet this is apparently the creditors' main contention.

This view that section 77B cannot apply to insurance corporations in their changed conditions in rehabilitation under the superintendent finds support in some of the decisions under 77B. In re National Surety Company (D. C.) 7 F. Supp. 959; In re Peoria Life Insurance Company (D. C. Ill. July 18, 1934).[1]

But, say the creditors, section 77B has expressly provided that whether a corporation otherwise excluded comes under the section, it must be determined by its "present operations" and under such provision, the "present operations" of the debtor are not that of an insurance company and it is amenable to the section.

The kind of business done by the debtor has already been discussed. But no consideration has been given to the present "operations clause" of the section.

The pertinent parts of section 77B (11 USCA § 207) in this connection are:

"Any corporation which could become a bankrupt under section 4 [section 22] of this title, and any railroad or other transportation corporation * * * may file an original petition, or, before adjudication in an involuntary proceeding, an answer, or in any proceeding pending in bankruptcy, whether filed before or after this section becomes effective, provided the present operations of such corporation do not exclude it hereunder, and whether or not the corporation has been adjudicated a bankrupt, a petition stating * * *"

It should be noted first that this relates to a petition by the debtor corporation and not to an involuntary petition by creditors and would, therefore, seem inapplicable here. This is discussed later herein.

The meaning of the words "present operations" is obscure.

It may be intended to exclude corporations otherwise amenable to 77B, which are so far toward liquidation in bankruptcy, especially in cases where the bankruptcy began before the petition was filed under section 77B, that there is not enough left to reorganize, though, in view of the requirements of the consent of two-thirds of the creditors and the discretion vested in the court, a provision to that end seems unnecessary and, if thought desirable, could have been stated in more specific language.

Without the words "provided the present operations of such corporation do not exclude it hereunder," the provision might well be construed as making clear that a qualified corporation was not disqualified from filing a petition because of a pending bankruptcy proceeding, at least, if voluntary, even if filed before 77B became effective and regardless of adjudication. Perhaps it may be so construed with the quoted words contained therein.

■ It is difficult to see how this "present operations" provision of section 77B can apply to an insurance or a banking corporation, for such provision applies only where there is a "proceeding pending in bankruptcy." There could not be a proceeding pending in bankruptcy in case of an insurance or banking corporation because both the said corporations are expressly excluded from becoming either voluntary or involuntary bankrupts under section 4 of the Bankruptcy Act, as amended.

Moreover, even if this "present operations" provision were applicable to an insurance corporation, as is this debtor, the condition precedent a "proceeding pending in bankruptcy" does not here exist.

■ The court does not understand that creditors contend that the rehabilitation proceedings under the direction of the superintendent are a proceeding pending in bankruptcy within the meaning of 77B. If so contended, it could not be sustained, for a few words later occur the words "whether or not the corporation has been adjudicated a bankrupt." Certainly no such thing can happen in rehabilitation proceedings.

So the "present operations" provision of the statute is not applicable and would not be applicable were the debtor petitioning. If the debtor, while in rehabilitation, is not an insurance corporation, the debtor needs no support from this provision for the section gives jurisdiction over qualified corporations without reliance on the "present operations" clause. Reliance on that provision weakens the argument that the debtor in rehabilitation is not an insurance corporation.

This phrase containing the words "present operations" seems to indicate conditional exclusion of something previously included, rather than inclusion, conditional or otherwise, of something previously excluded.

---

[1] No opinion filed.

The "present operations" provision has even less application where the petition for reorganization is filed by creditors.

The only conditions under which creditors may file a petition for reorganization of an insolvent corporation which is amenable to section 77B are these:

(1) A prior proceeding in bankruptcy.

(2) A prior equity receivership.

(3) An act of bankruptcy.

In the statement of the requirements for filing a creditors' petition, there is no mention of the provision "in any proceeding in bankruptcy * * * whether filed before or after this section becomes effective, provided the present operations of such corporation do not exclude it hereunder, and whether or not the corporation has been adjudicated a bankrupt," and no other mention of or reference to the "present operations" of the corporation against which a petition is filed.

The limited phrase "a prior proceeding in bankruptcy" is the whole expression so far as the filing of creditors' petitions is concerned.

Nor is there any ground for holding that though not expressed it will be implied that the "present operations" provision applies when creditors filed a petition for reorganization of a corporation.

But even if expressed as fully as it is concerning a petition by the debtor, it would not avail the creditors here. There is no proceeding in bankruptcy here, and, therefore, the "present operations" provision can have no application to this debtor.

Since the debtor was an insurance corporation before rehabilitation, was such at the filing of the petition, and the "present operations" provision of section 77B does not apply to the debtor in this proceeding, it follows that the court is without jurisdiction to act on the creditors' petition for reorganization and it must be dismissed.

The court is not unmindful of the fact that while section 77B was pending in Congress, the superintendent's address urging legislation to put reorganization of insurance companies under the Bankruptcy Act was spread upon the Congressional record, after which the pending bill was amended. Despite the claim of the petitioning creditors that the bill was amended for the purpose including the superintendent's suggestions in 77B, it does not appear that such was the effect of the amendment.

This object might easily have been accomplished by specific mention of insurance companies, as was made of railroad corporations, thus taking insurance companies out of the prohibition of section 4 of the Bankruptcy Act, as amended. There might have been specific mention of title insurance companies if it were not desired to include all insurance companies. But nothing of the sort was done. The language used is too vague and ambiguous to override the specific prohibition of section 4, as amended.

It is with regret that this court dismisses the petition, for the superiority of section 77B for reorganization of the debtor corporation with its ramifications in many states is manifest. It may mean the difference between reorganization and liquidation. But the court must take the law as it is written.